Good morning and may it please this honorable court Desiree Ferguson appearing on behalf of the petitioner appellant Jeffrey Curry and I have reserved or will reserve two minutes for rebuttal. It is undisputed in this case that Mr. Curry fled on foot. Police chased him in a vehicle which struck him while traveling at speeds of upwards of 25 to 30 miles per hour. It is further undisputed that Mr. Curry's body hit the hood of the car and then fell onto the concrete and that several police officers then converged on his body and bashed his head in the concrete five or ten times. Most importantly, it is undisputed that when Mr. Curry asked for medical attention, detectives told him that he must talk to them first. Did they ask him once if he wanted to go to the hospital and he said no? That was much later, yes, your honor, much later. I thought early on they asked him if he wanted to go. They did not? I believe it's very clear in the record, your honor, that the very first time that he indicated he wanted medical attention, their response was, yeah, we're going to take you when we get done here. And then there was a later indication where he further made that request again and their response was, we'll get you over to the hospital when we're done talking to you. Well, I mean, you know, this is a habeas case and so the state court's factual findings are binding upon us unless, I forget the formulation, you have clear and convincing evidence, I think, that they're wrong. I mean, that's something, it's an extremely high standard to set aside the state court's factual findings and here the state trial court, after an evidentiary hearing, I think took a different view of your client's state of mind during the interview than the one you set forth in your brief. I mean, he said that he wasn't hurt as badly as one might expect from being hit by the car and so on and that he seemed reasonably lucid and that his decision to talk was voluntary. So, I mean, what's the compelling evidence to set aside those determinations? Well, the reason that I started out with those facts, Your Honor, rather than many of the other facts that are also, I think, relevant to this inquiry, is that the withdrawal or the measures that the police officers took to withhold medical attention amount to objectively coercive state action. He was really at their mercy at that point and he really was left with no choice. I mean, there are factual findings to the contrary. I mean, I'm not sure what you're citing and what facts you would cite in support of your conclusion that it was objectively coercive, but the trial court said he's lucid, he's really not in that much pain, and frankly, when he went to the hospital, the doctor said there isn't much to treat here. Well, those facts are not in dispute. Now, the court's interpretation of what those facts meant in the legal construct obviously is at issue. But didn't the state court ultimately make a credibility determination? I mean, they heard all the evidence you're talking about. They looked at the video itself of the confession, correct? Yes, that's true, I believe. And they observed him and how he was acting. Seemed perfectly fine. And they made a determination. And I guess what you're saying is, Judge, look at these same facts and come to a different ultimate conclusion. And back to Judge Ketledge's first question, which is, this isn't some sort of de novo review, right? We're under the Ed Poddeferent standard. So how do we do that? In other words, how do we take the very same facts and come to a different conclusion? I believe that the deference, I mean, if these facts were in dispute, if there was some question about whether or not they withheld medical attention or whether or not they bashed his head on the concrete ten times, then that would be something that you would be obligated to defer to the trial court on. But in terms of the coerciveness of that action. Can I restate your, and I'm sorry to do this to you, but can I restate your position? What your position is, you don't have to change any of the facts. The facts are the facts. And what you're saying then is the law was unreasonably applied. Yes, that is what I'm saying. Okay. And so then when you look at the video, it's undisputed first that the first portion, right, at least post-Judge Lawson's opinion, the first portion was impromptu of his confession. Yes. They then give him his Miranda warnings. Yes. And he then confesses in full. Yes. So under ELSTAD, which is clearly established, why isn't that sufficient? Well, you're leading me into the second issue, which is fine, because we loop back to the voluntariness question in terms of assessing whether the issuance of the Miranda warnings was effective and whether it was sufficient to purge the taint of the delay in delivering the Miranda warnings. The ELSTAD court looked to whether there was a break in the stream of events in terms of assessing whether the delivery of the warnings was sufficient to purge the taint. And the ELSTAD court talked about the passage of time between the confessions, the change in place of interrogators, and the change in identity of interrogators. The application of that law to my case leads to the conclusion that there was not a sufficient break. I thought Missouri v. Siebert was the case that emphasized, or at least in the plurality opinion, and that's kind of where I'm going here, emphasized the importance of having some kind of break between the pre-warned confession and the post-warned confession. Well, that language that I just spoke comes directly from ELSTAD at page 310, 470 U.S. at 310. And ELSTAD really was a precursor to the plurality decision in Siebert, which developed more elaborate criteria for deciding whether there was a break. But that language from ELSTAD really says the same thing. And in this case, there was no change, as the court knows, no change in the interrogation site, in the interrogators, and no passage of time whatsoever. So there's nothing, and if we do employ the Siebert criteria, which I understand the controversy of doing that. I mean, our court has already said that Siebert doesn't count as clearly established law for purposes of habeas cases, right? So we rely on ELSTAD then, and then I will direct the court's attention to that. What makes this case different from ELSTAD? In ELSTAD, the young man was questioned in his home, with his mother present initially. And then the second interrogation took place in the station house, with totally different interrogators. There was a significant break in time. All of those things served to give the young man an opportunity to appreciate that the delivery of the Miranda warnings was in place, that his rights were in place, and he now had a right to cease talking or to not talk to the police. But in the absence of any of those kinds of criteria that break, again, break the stream of events, that's the language from ELSTAD, there's nothing that told my client, okay, now that you've been given these Miranda warnings, you can stop talking. There was nothing that could. Well, other than the warnings themselves, right? I mean, that's what they say, you have the right to remain silent. Yes, but the case law says that there has to be something in the instance where the warnings are given after he's already confessed. He's already totally incriminated himself. And then if the warnings are given at that point, I'm sorry to over talk. No, not at all. I'm sorry to speak over you. It's not a cable talk show here. I'm kind of looking at this clock getting a little nervous. I think I've made my major points there. I do want to speak to harm. Yeah, I was just going to ask you, but go ahead. I would ask the Court furthermore to find that there is a substantial and injurious effect that influenced the verdict in this case. And the reason is that there was really very little evidence indicating that, in fact, Mr. Curry was the shooter, as opposed to the other person who was standing on the porch also holding a gun. In the absence of this confession, the jury would have been able to decide then, who do we, do we think Mr. Curry was the shooter? And there was really nothing without the confession, nothing. The evidence was just as consistent with finding that he was not the shooter. Confessions are often pretty important. I understand what you said just now, to refer to the entirety of his confession, i.e., the pre-warned confession and sort of the post-warn repetition. I know you think that both were coerced, but if we thought that both were coerced, I mean, the State Court here said that the pre-warned confession was wrongfully admitted at trial, right? Actually, no. One or the other. Actually, no. The District Court did, but the Michigan Court of Appeals actually followed. The pre-warned confession is harmless because the post-warned confession properly came in under his analysis, and so the pre-warned confession would just be cumulative of what the jury could properly hear from the post-warned confession. Well, of course I'm not conceding that. Oh, I know. This is a hypothetical question. You're asking me if you find that the post-warned confession was properly admitted. Then yes, the pre-warned is harmless. There isn't a big difference, or big enough, right? But I'll say this. Actually, I'm going to retract what I just said. No, I think your time's up. I'm just kidding. I'm just kidding. Go ahead. Because the second point I wanted to make about harm was that Mr. Curry would then have been able also, as an alternative, he would have been able to testify and say and explain to the jury that this man shot me before, he came charging at me, he was holding a gun, we got into a tussle. Wait, explain to me why. I'm not sure I follow that. He could have testified? No, no, no. But the point is, the point is harmlessness. The second one was properly, you have to assume the second one's properly admitted. Then it's merely cumulative of the first, and so it's harmless. In other words, if the second one's admitted properly, you have to take that as true. He can't testify, if your worry about him testifying is that he confessed and he's going to be confronted with that. I'm sorry, I'm not... Okay, so if the second one came in properly, just hypothetically, and now we're looking at whether the admission of the first one was harmful, he would have the same problem trying to testify in that situation, right? That he would have if the whole thing was proper, because he could be impeached with the post-mortem confession. It's all the stuff that comes after the Miranda warnings that puts him in such a terrible, scandalous light, that he was so harmed and the jury was then unable to give credence to his self-defense version. Can I just ask her one more question? I'm sorry, this is my time, not yours. So the key to your case, just to distill it down to one point, is we have to find that this case is different than Alstad, because there wasn't a change in location, change in interrogators, really a significant break in time. And so Alstad doesn't control the second confession should be suppressed, and that wasn't harmless, correct? Well, the key to my, the first part of what you said I would agree with, the key to my case from my point of view, is that the second part of the confession was involuntary, the whole confession was involuntary, and we loop back to involuntariness. If you find that the Miranda warnings were sufficient, then we loop back to the voluntariness. Okay, so then you go to the Sixth Amendment. We'll hear from Mr. Allen. Good morning, Your Honors. Michigan Assistant Attorney General Chris Allen on behalf of the State. As this Court is well aware, a writ of habeas corpus is an extraordinary remedy, and the State court determination here is entitled to heavy deference under AEDPA. We are aware of the whole AEDPA regime, I can assure you. And the State court was wrong as to the first confession, right? You concede that. Correct, Your Honor. We agree with the decision. The pre-warned confession? Yes, the pre-warned confession, the minute and a half or two minutes. I would quibble with the use of confession really throughout. This is an admission at best that Mr. Curry was present, that there was a gun involved. Right, he contested some elements of it. I've read what he said. But can I take you to the Elstad question, do you mind? Because that to me seems to be the key here, right? Was, if you look at the language of Elstad, your opponent's correct, that talks about change in location, talks about time, talks about a break, talks about different interrogators, none of that happened here, right? That's correct, I would agree with that characterization. But I would disagree that that is, first of all, controlling. And Elstad itself ruled against the petitioner. So, and sorry, setting Siebert aside for the reasons I briefed, Siebert's not clearly established precedent. Elstad provided the general rule about these so-called midstream Miranda warnings by saying, quote, a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disqualified from waiving his rights and confessing after he's been given the requisite warnings. Only, quote, if there's a deliberately coercive or improper tactics, would that sort of nullify this presumption that it's a voluntary statement? So these other... Right, but what they then go on to say is that, and I agree with everything you just said, but it says it was the court's view that the prior answer, not unwarned questioning, impaired response's ability to give a valid waiver. They're talking about Oregon right now. And that only a last time and change of place could dissipate what it turned to be the coercive impact. And then they say when a prior statement is actually coerced, which you can see here, just for the purpose of this. I would disagree that it's coerced. The time that passes between the confessions, the change in place of interrogations, and the change in identity of interrogators all bear on whether the coercion has carried over into the second one. So what you're saying is none of those are relevant because the first confession wasn't coerced. Correct, Your Honor. I think if there was any indicia of coercion here, then that would certainly be relevant to the determination of whether Miranda sort of cut the chain. That brings us back to your opponent's initial argument, and she made this at the outset, which is you have to look at the totality of the circumstances. And I agree the epideference poses a big hurdle to her, but you have to look at the totality of the circumstances. He was hit, he was slammed into the ground, he was brought. So all of this around that initial confession or admission, to use the better language, looks, she's saying it looks and smells like he was coerced in that, in effect. The record does not indicate that, and the factual findings of the state trial court, which Your Honor has emphasized earlier, are presumed to be correct unless clearly and convincingly shown otherwise. We'd have to find it's an unreasonable application of Elstad to rule in the petitioner's favor, would we not? I'm sorry, Your Honor? We would have to find that the state court made an unreasonable application of the Elstad case to rule in the petitioner's favor. I think that's correct, Your Honor. The facts here, these so-called uncontested facts that Ms. Ferguson explains to you, I think are certainly relevant in the broad scheme, but the sort of source of the minor injuries here, I think is a little beside the point. The point of coercion, the sort of physical discomfort or level of inebriation or what have you, in the interrogation room during the giving of the statements, that's what's relevant here. And the trial court made numerous findings. Could you cite the specific ones, just to remind me of what those were? Sure. And these are from the Michigan Court of Appeals adoption of the trial court's statement. The video did not show that Curry was under the influence of any alcohol, medication or drugs. To the contrary, Curry appeared coherent, not in any distress. He did not appear to be sleepy. The interview itself was not prolonged. It was approximately 90 minutes in its entirety, including sort of both aspects of this. And I think really importantly... Denying him the ability to get medical care until he told them all they wanted to hear about the event. I would disagree with that characterization. I mean, what, if any, factual finding was there specific to that question, about you're going to be here until we're done? I don't know if there was a specific factual finding. The video and the transcript sort of speak for themselves. I mean, everything you said kind of goes to the distress part. Intoxication, distress, as opposed to withholding medical care. Now maybe the medical care was less necessary if he's not in distress.  And I think it's important to step back and again, as your honors noted earlier, this is a habeas case. We have to look at what is the established Supreme Court precedent on these types of cases where... If someone asks for medical care and you say, so he gets hit, right? That's undisputed. By a car. He says, can I get medical care? And the officer says, yeah, when you're done talking to me. I mean, what should we do with that fact? Does that sound pretty accurate here? I think that's pretty accurate. I think that it's not the full picture because immediately after or within a few statements after... And I'm going to let you get to the full picture, but what should we do with that fact? I think the court should consider it in the full picture. The fact that the officer said, we'll get you over to the hospital when we get done talking and we'll take some pictures of that. We'll get to the bottom of it. That was followed within less than a minute with the officer saying multiple times, you don't have to talk to us. This was not a recitation of Miranda that was off a three by five card like on Law and Order where they spit it out really fast. They went through it. The officer said, I believe four times, you don't have to talk to us if you don't want to. I'm not going to force you to talk to us. If you want to continue talking to us, that's fine. These are paraphrases. This is after he initially... He admits that he shot in self-defense, right? Right. Yeah, it's very vague and I think that goes a little bit to the harmlessness element. It also goes, I think, to the Elstad question. The cat wasn't out of the bag here. There was minimal facts that are relevant to this case that came out before Miranda was given. One of those was that he shot him. That's pretty important, right? Yes. He never says that he pulled the trigger beforehand. If we're looking at this purely in isolation, it's a couple sentences and certainly they're relevant. I'm not minimizing that they are some kind of admission, but they're certainly not a confession. He doesn't say self-defense and that's when the officer says, so you're saying self-defense. It's very obvious from his sort of brief recitation of what happened that he went to the house, they tussled for it, he put a gun into my stomach and I took it. We tussled for it. Nothing about the killing. He does admit that the individual is dead as far as he knows, but he doesn't say I pulled the trigger, I shot him in self-defense or anything saying that he shot him at all. That comes much later, after Miranda is given, after Miranda is made quite clear to Mr. Curry. I think a viewing of the video in conjunction with the state court findings makes quite clear that Mr. Curry was not forced to do anything. He was very eager to tell his side of the story and he says that to the officer. If we find both confessions were improperly admitted, is it still harmless? I think there's an argument to make that it is harmless, Your Honor, because I think the strongest piece of evidence that it wasn't self-defense, the gunshot wound to the victim's head was straight front to back. There's testimony from the medical examiner that this could not have been face-to-face. Straight, you mean back to front? Yes, I'm sorry, back to front. In addition, there's multiple witnesses. Mr. Christopher Ray is the one who answered the door initially. He knows Mr. Curry, recognizes him. He says that Curry announced his name as Jeff and said he wanted to see the victim, Mr. Jackson. And Jackson comes out. I believe all three who were in the house, the Mulders and Mr. Ray, said that Jackson didn't have a weapon. He walked outside and none of them saw the actual shooting. That's correct, but they all heard gunshots, didn't hear any sort of tussling and heard Mr. Jackson sort of plead for his life. So it's not as if this is this admission that he was there. Well, that's already sort of established by the evidence. What happened to Curry's weapon? I don't believe it was recovered, Your Honor. I apologize. That fact's not at the tip of my tongue, but I believe it was not recovered. What caliber was it? Do we know that? It was a revolver because there were, I don't recall the... There were no casings at the scene, so there was an inference that it was a revolver. So the caliber of the bullets, I'm not sure. That was testified to by a ballistics expert, but I don't have that fact because there was a bullet found, multiple bullets found. I believe at least three, and of course the one found in the victim's head or his skull. So that's assuming both of the statements were not admissible. Again, we've conceded that the first aspect of it was not admissible. I just wanted to briefly touch on the question of Siebert and whether that has really any bearing on this case, and I think that it doesn't. As this Court made clear in United States v. Wray, there was no holding in that case. Now, if this was a materially indistinguishable case from Siebert, then that might be a different question. But here, for the reasons I've stated, there really wasn't. It really was not. What's the duration of the first interrogation before the Miranda warning was given, and then the later interrogation? The initial interview was approximately two minutes. I don't have that down to the second, but approximately. And subsequent to that, it was approximately 90 minutes. So I think the district court's characterization that the two minutes was sort of like the trailer to the longer movie, I think, is a pretty apt one. A lot of times you can tell. This isn't one of those, Your Honor. And unless there are any questions, I'd be glad to rest on my brief. I have a question about his stomach. Did he have an open wound in his stomach at that time? He had what appeared to be a fully healed, and what was a fully healed wound. I don't think there's any indication that the officer was attempting to sort of pry into this case. But Mr. Curry didn't have a shirt on at this point, and the wound in his stomach was clearly unhealed, and so the officer sort of asked him, what's that about? And Curry's answer was that the victim had shot him several years prior, I believe. And so the fact that that happened to have anything to do with this case I don't think can reasonably be seen as the officer sort of trying to get into the matter. But again, we've conceded that the pre-Miranda statement is inadmissible. So it's a little bit inopposite for purposes of this case. I was just wondering, did he have his shirt off, or how did they see a wound on his stomach? Yes, Your Honor, he did have his shirt off, and I tried to look at the record and determine why. At some point, I believe they offered him something to cover himself in this interrogation room. I'm not sure why he didn't have a shirt at this point, to the extent that that matters to the analysis. All right. Thank you. I just wanted to clarify a few of the factual inquiries that you had. The weapon was never recovered. Counsel indicated that there was a witness, and I think he clarified later, but I just want to be sure you understand, there was no witness to the shooting. Not to the shooting, but to the fact that they were both there on the porch. Yes, but nobody saw who the shooter was. In response to your question about harm, the medical evidence, yes, it does lead to an inference, or it does support the inference that it was not a self-defense shooting, but it doesn't tell us anything about who the shooter was, which is obviously the most important question. Was there testimony that some of these other people had a weapon and fired it, besides Curry? No, because no. The people that were in the house did not see the shooting. They heard a shooting, and I believe that they saw, they said that they, well, the one gentleman said that he saw Mr. Curry and the other man with a gun, but nobody. The unidentified person that was standing on the porch with Mr. Curry, who I'm suggesting could have been the other shooter, according to the evidence. Well, your client never did say there was a third person who did all the shooting, did he, even in his statements? Oh, yes, he did. So that was beneficial to him, to introduce the statement. It wasn't harmful. Well, except that, as I say, all the inconsistencies and incongruencies in his statement are what make the statement so harmful, because nobody, he just couldn't be believed. He's all over the place. He's blaming some female that's, I mean, it was a ridiculous, which in my opinion supports that he was really high on something, and he does appear very agitated, and I think the officer even admitted that at the Walker hearing, that he was in a very agitated, animated state, and he's just saying all kinds of ridiculous things, and he's talking about rims on his cars and gold chains and all kinds of things that had nothing to do with anything. And you asked also, one of you. I want to just, we'll give you 60 seconds to whatever sort of wrap up you would like. Okay. You asked whether he actually said that he did the shooting before the Miranda, and it's clear that he did. He was asked, you shot in self-defense, is that what you're saying, and he says, I guess so. So he did. I want to say one thing about the, because you do seem to be very concerned about the voluntariness issue, and I just want to point out that the trial courts or the court of appeals opinion with respect to whether he appeared to be in distress, or he was found to have been seriously injured later on, isn't really directly relevant to this point. I think you could, waterboarding probably doesn't leave any evidence of distress either. And I would direct the court's attention to the Blackburn v. Alabama case where it was said, the blood of the accused is not the only hallmark of unconstitutional inquisition. So I do, in some, I just ask the court to find that the court, the court of appeals unreasonably applied, particularly the Elstad decision, and to grant a writ of habeas corpus. Thank you for your arguments.